**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS**

| | |
|---|---|
| UNITED STATES OF AMERICA, )<br>)<br>Plaintiff, )<br>)<br>v. )<br>)<br>ROBERT VASQUEZ, )<br>)<br>Defendant. )<br>_____) | CRIMINAL ACTION<br><br>No. 12-20066-20-KHV |

**MEMORANDUM AND ORDER**

A grand jury charged Robert Vasquez and some 50 other defendants with conspiracy to manufacture, to possess with intent to distribute and to distribute 280 grams or more of cocaine base and to possess with intent to distribute and to distribute five kilograms or more of a mixture and substance containing cocaine. See Second Superseding Indictment (Doc. #402), Counts 1. The grand jury also charged Vasquez with conspiracy to commit money laundering and three counts of money laundering. See id., Counts 2, 69, 73, 75. This matter is before the Court on Defendant's Motion To Suppress The Fruits Of The Detention And Search That Occurred At W US54 MM 140, Pratt, Kansas On January 13, 2012 (Doc. #558) filed April 10, 2013. On July 16, 2013, the Court held an evidentiary hearing. For reasons stated below, the Court overrules defendant's motion.

**Facts**

Based on testimony and exhibits received at the hearing, the Court finds the following facts:

In October of 2010, the United States Drug Enforcement Administration ("DEA") initiated an investigation into the distribution of cocaine by an organization run by Djuane Sykes and his associates, a street gang in Kansas City, Kansas known as "Deuce Deuce." Special Agent Nicholas Wills and Task Force Officer Eric Jones led the investigation which involved the interception of

43 cellular telephones, including multiple roving Title III intercepts on Hector Aguilera. Based on the initial intercepts of three of Sykes' telephones, officers identified multiple layers of sources of cocaine, which was being funneled by various means from Mexico to the Kansas City metropolitan area. From June of 2011 through April of 2012, officers intercepted hundreds of calls.

On January 10, 2012, telephone intercepts revealed that in payment for a prior shipment of cocaine, Aguilera intended to send by tractor trailer a large amount of U.S. currency to a Mexican source or sources of supply. On January 12, 2012, investigators learned that the courier for the shipment of currency had arrived in Kansas City and that Aguilera intended to deliver more than $500,000.00 to the courier the following morning.

On January 13, 2012, Aguilera arranged to meet the courier near Interstate 435 and exit 8B in Edwardsville, Kansas. Agents had set up surveillance at a Shell gas station near the location and they saw Aguilera and Gerardo Flores-Avila arrive at the gas station. While intercepting calls between Aguilera and another individual, agents followed Aguilera and Flores-Avila, who were traveling in a Dodge pickup truck, a short distance to Swift Trucking at 9000 Woodend Road, Edwardsville, Kansas. Aguilera talked to an unknown individual on the phone about meeting the courier. Agents then observed Robert Vasquez enter Aguilera's truck. After Aguilera drove a short distance in the parking lot, Vasquez got out of the truck and walked away carrying a black duffel bag. Vasquez then got into a Swift semi truck with a trailer and drove away from the lot. Immediately thereafter, Aguilera called an unknown individual and said that "It's been done, it's all good."

Vasquez drove southbound on I-435, then southbound on I-35 to Wichita, Kansas. DEA investigators in four or five vehicles maintained constant visual surveillance. When Vasquez

traveled west out of Wichita on Highway 54, Officer Jones contacted the Kansas Highway Patrol and asked to have a trooper conduct a stop of defendant's vehicle. Officer Jones later gave Trooper Lee Rose a description of the semi truck including the unit number. Officer Jones told Trooper Rose to conduct a vehicle stop and also said that the driver was in possession of a black duffel bag which he believed contained currency.

At approximately 3:59 p.m., Trooper Rose observed Vasquez's truck on Highway 54 in Pratt County, Kansas and initiated a commercial vehicle safety inspection. Trooper Rose asked Vasquez for his driver's license and medical card. Vasquez produced a Texas driver's licence, his permit book, log book and medical card. Upon questioning, Vasquez explained that he was traveling from Edwardsville, Kansas to El Paso, Texas and that he did not have any shipping papers because his truck was empty. Trooper Rose thought it was unusual to travel such a long distance with an empty trailer. Because of safety concerns at the location of the stop on a two lane highway, Trooper Rose asked Vasquez to move his truck to a nearby truck stop to complete the safety inspection. Vasquez complied.

At the truck stop, Vasquez exited his truck and assisted in various aspects of the inspection. Trooper Rose completed a Level II inspection and found no violations. Trooper Rose also completed a Kansas Highway Patrol Driver/Vehicle Examination Report and ran routine checks through dispatch of defendant's driver's license and registration and the USDOT number associated with the truck. At the completion of the inspection, Trooper Rose returned all of the documents and gave defendant a copy of the examination report.[1]

---

[1] Trooper Rose thought that Vasquez appeared very nervous throughout the stop. Trooper Rose testified that Vasquez vigorously chewed gum and was much more nervous than a

(continued...)

Trooper Rose confirmed with Vasquez that he had all of his documents back in his possession. Trooper Rose told Vasquez to have a safe trip. Vasquez shook Trooper Rose's hand and thanked him. Trooper Rose turned and walked away. Some three or four seconds later, after Vasquez had climbed up to the cab and opened the door, Trooper Rose turned and asked defendant if he could ask a few more questions. Vasquez replied, "Yeah." Trooper Rose asked Vasquez about any illegal contraband in the truck such as guns, weapons, drugs or large amounts of money. Vasquez replied in a repetitive, "No, No sir," to each inquiry. Trooper Rose then asked Vasquez if he minded if he searched the truck and trailer. Vasquez replied "no," that he did not mind if Trooper Rose searched the vehicle. Trooper Rose then asked Vasquez to step over to the front of his patrol vehicle and patted him down. Trooper Rose again asked Vasquez if he consented to a search of the truck and trailer and Vasquez replied, "Go ahead."

Trooper Rose searched the cab of the truck. Under the bed in the sleeper berth, he found a black duffel bag that contained wrapped bundles of what he believed to be U.S. currency. Agents later determined that the bag contained $549,749.00 in U.S. currency. Upon discovery of the money in the duffel bag, Trooper Rose placed Vasquez in handcuffs. Trooper Rose advised Vasquez of his Miranda rights at 4:32 p.m.

## Analysis

Defendant seeks to suppress evidence from the search of his vehicle and subsequent statements because officers did not have a sufficient basis to stop him or search his vehicle.

---

[1](...continued)
typical commercial vehicle driver in such situations. Trooper Rose also noticed a strong odor of air freshener coming from the cab of the truck.

**I.    Traffic Stop**

Trooper Rose testified that he stopped defendant's vehicle because (1) DEA Task Force Officer Jones told him to detain the vehicle and (2) he intended to conduct a commercial vehicle safety inspection under K.S.A. § 74-2108.  For reasons explained below, the Court finds that the traffic stop was valid on both grounds.[2]

   A.    Reasonable Suspicion Based On Direction From Office Jones

Defendant argues that Trooper Rose did not have reasonable suspicion to stop his vehicle. A traffic stop constitutes a seizure for purposes of the Fourth Amendment "even though the purpose of the stop is limited and the resulting detention quite brief." Brendlin v. California, 127 S. Ct. 2400, 2406 (2007) (quoting Delaware v. Prouse, 440 U.S. 648, 653 (1979)).  The Court analyzes the legality of a traffic stop under the investigative detention principles of Terry v. Ohio, 392 U.S. 1 (1968).  In cases of investigatory stops, the Fourth Amendment is satisfied if the officer's action is supported by "reasonable suspicion to believe that criminal activity may be afoot." United States v. Arvizu, 534 U.S. 266, 273 (2002) (internal quotation omitted).  Reasonable suspicion requires a "particularized and objective basis for suspecting the particular person stopped of criminal activity." United States v. Cortez, 449 U.S. 411, 417-18 (1981).  Although an officer's reliance on a mere

---

    [2]    Except for the facts that he knows, an officer's state of mind is not ordinarily relevant to the reasonable suspicion and probable cause inquiries.  See Devenpeck v. Alford, 543 U.S. 146, 153 (2004) (subjective reason for making arrest need not be criminal offense as to which known facts provide probable cause); Whren v. United States, 517 U.S. 806, 813 (1996) (fact that officer does not have state of mind which is hypothecated by reasons which provide legal justification for his action does not invalidate action taken if circumstances, viewed objectively, justify that action); United States v. Villamonte-Marquez, 462 U.S. 579, 584, n.3 (1983) (dismissing idea that ulterior motive might strip agents of legal justification for search); United States v. Galindo-Gonzales, 142 F.3d 1217, 1224 (10th Cir. 1998) (reasonableness of officer's questions not limited by his motivation in asking them).  The Fourth Amendment's concern with reasonableness allows certain actions to be taken in certain circumstances, whatever the subjective intent.  Whren, 517 U.S. at 814.

hunch is insufficient to justify a stop, the likelihood of criminal activity need not rise to the level required for probable cause, and it falls considerably short of satisfying a preponderance of the evidence standard. Arvizu, 534 U.S. at 274. In determining whether reasonable suspicion existed, the Court considers the totality of the circumstances, United States v. Sokolow, 490 U.S. 1, 8 (1989), including the collective knowledge of those officers involved in the investigation, United States v. Hinojos, 107 F.3d 765, 768 (10th Cir. 1997). The government bears the burden of proving the reasonableness of the officers' suspicion. United States v. Salzano, 158 F.3d 1107, 1111 (10th Cir. 1998); see also United States v. Lutz, 207 F. Supp.2d 1247, 1255 (D. Kan. 2002) (government must show traffic stop justified by reasonable articulable suspicion of illegal activity).

Under the collective knowledge doctrine, law enforcement officers may rely on a bulletin or alert to conduct a stop or make an arrest. United States v. Wilkinson, 633 F.3d 938, 941 (10th Cir. 2011); United States v. Rodriguez-Rodriguez, 550 F.3d 1223, 1227 (10th Cir. 2008). Under the collective knowledge doctrine, the relevant inquiry is whether the officer who issued the alert had the requisite level of suspicion, not whether the officer making the stop independently had reasonable suspicion. See United States v. Whitley, 680 F.3d 1227, 1234 (10th Cir. 2012); Wilkinson, 633 F.3d at 941.[3]

---

[3] The collective knowledge doctrine has two categories – vertical and horizontal. United States v. Chavez, 534 F.3d 1338, 1345-46 (10th Cir. 2008). The instant matter involves the vertical category which applies when an officer having probable cause or reasonable suspicion instructs another officer to act without communicating all of the information necessary to justify the action. Whitley, 680 F.3d at 1234. In contrast, the horizontal collective knowledge doctrine applies when a number of individual officers have pieces of the probable cause or reasonable suspicion puzzle, but no single officer has sufficient information to satisfy the necessary standard. See id. at 1234 n.3. The inquiry in such a circumstance is "whether the individual officers have communicated the information they possess individually, thereby pooling their collective knowledge." Id. (further citation omitted).

Here, Officer Jones had reasonable suspicion that defendant was transporting a large amount of currency in connection with a conspiracy to distribute cocaine based on (1) intercepted phone calls before defendant met Hector Aguilera the morning of June 13, 2012,[4] (2) the circumstances of defendant's meeting with Aguilera including defendant walking away from the meeting with a black duffel bag and getting into a Swift semi truck with a trailer, and (3) Aguilera's comment by phone immediately after the meeting that "It's been done, it's all good." See, e.g., United States v. Soto, 375 F.3d 1219, 1222-23 (10th Cir. 2004); United States v. Hernandez, No. 04-20115-JWL, 2006 WL 1232855, at *8 (D. Kan. May 5, 2006). Accordingly, the stop of defendant's vehicle was lawful. See Chavez, 534 F.3d at 1347-48 (upholding stop when federal agent who requested officer to stop suspect had "all the requisite probable cause components" but did not communicate them to officer).

B.  Administrative Investigation

Administrative stops of commercial vehicles are permissible both under Kansas law and federal law. Under Kansas law, the Kansas Highway Patrol may stop "motor carriers" at any time to check compliance with safety regulations. K.S.A. § 74-2108; see United States v. Herrera, 444 F.3d 1238, 1244-45 (10th Cir. 2006) (assuming Kansas law properly permits Kansas Highway Patrol to stop commercial vehicles for safety inspections). Defendant does not dispute that the semi truck and trailer satisfy the definition of a "motor carrier" under Kansas law. Accordingly, Trooper Rose could stop defendant's vehicle for a commercial safety inspection under K.S.A. § 74-2108.

---

[4]  The intercepted phone calls before the meeting indicated in part that (1) Aguilera was involved in the distribution of significant amounts of cocaine in the Kansas City area, (2) Aguilera planned to meet a courier the morning of January 13, 2012 to send some $500,000 by tractor trailer to a Mexican source of cocaine, (3) the courier would be wearing black pants and a brown jacket and (4) Aguilera would meet the courier near I-435 and exit 8B.

## II. Search Of Defendant's Vehicle

Defendant argues that he did not voluntarily consent to the vehicle search because he was already under arrest.[5] The government bears the burden to show that defendant's consent was voluntary. See United States v. Sanchez, 89 F.3d 715, 718 (10th Cir. 1996). To establish that defendant's consent was voluntary, the government must (1) proffer clear and positive testimony that consent was unequivocal and specific and freely and intelligently given and (2) prove that consent was given without implied or express duress or coercion. Id. at 719 (citing United States v. McRae, 81 F.3d 1528, 1537 (10th Cir. 1996)). Consent to search may be voluntary even though the consenting party is being detained when consent is given. United States v. Doyle, 129 F.3d 1372, 1377 (10th Cir. 1997). Whether consent is voluntary is a question of fact to be determined from the totality of the circumstances. See Soto, 988 F.2d at 1557. Relevant factors include (1) the number of officers present; (2) whether the officer displayed his weapon; (3) prolonged retention of a person's personal effects such as identification; (4) the length of the stop; (5) physical touching by an officer; (6) use of aggressive language or tone of voice indicating that compliance with an officer's request is compulsory; (7) promises, inducements, deception or trickery; (8) physical and mental condition and capacity of defendant; (9) the officer's failure to warn a person when the encounter is over; (10) whether the officer administered a Miranda warning; (11) a request to accompany the officer to the station; (12) the officer's failure to advise the defendant that he is free to leave; (13) the officer's failure to warn a person that he or she does not have to consent to a search and (14) whether the stop occurred in a public location. United States v. Guerrero, 472 F.3d 784,

---

[5] Defendant also argues that Trooper Rose lacked probable cause to search the truck. Because defendant freely and voluntarily consented to the search, the Court need not reach the issue of probable cause.

790 (10th Cir. 2006); United States v. Ledesma, 447 F.3d 1307 (10th Cir. 2006); United States v. Sawyer, 441 F.3d 890, 895 (10th Cir. 2006); United States v. Rosborough, 366 F.3d 1145 (10th Cir. 2004); United States v. Zubia-Melendez, 263 F.3d 1155, 1163 (10th Cir. 2001); United States v. Hill, 199 F.3d 1143, 1148 (10th Cir. 1999) (in context of consensual encounter); United States v. Hernandez, 93 F.3d 1493, 1500 (10th Cir. 1996); see Soto, 988 F.2d at 1557-58 (evaluating similar factors in context of investigative detention). No one factor is dispositive. See Soto, 988 F.2d at 1557.

Whether an individual has voluntarily consented to a search is a question of fact that the Court must evaluate under the totality of the circumstances. Ohio v. Robinette, 519 U.S. 33, 39-40 (1996); Schneckloth v. Bustamonte, 412 U.S. 218, 226-27 (1973); United States v. Romero, 247 Fed. Appx. 955, 962 (10th Cir. 2007). Here, the government has satisfied its burden to show that defendant gave consent without implied duress or coercion. Trooper Rose was the only officer present, he did not display his weapon, he returned all of defendant's documentation and concluded all aspects of the safety inspection before asking for consent to ask additional questions, he did not use aggressive language and he did not threaten defendant or promise him anything in return for his consent to search. Other than to shake his hand after the safety inspection and conduct a brief pat down after defendant consented to the search, Trooper Rose did not physically touch Vasquez. In addition, the location of the encounter at a public truck stop weighs slightly in the government's favor. In the video of the traffic stop, Vasquez appears to give his consent freely and without hesitation or limitation. The circumstances of the stop (including the fact that Trooper Rose returned defendant's paperwork and walked away before asking additional questions) show that it was a consensual encounter.

A few factors weigh in favor of defendant. Trooper Rose did not administer a Miranda warning or give defendant a written consent form before he asked for consent to search. In addition, no evidence suggests that Trooper Rose informed defendant that he was free to leave or that he did not have to consent to search. These factors, however, are outweighed by the foregoing factors which suggest that defendant freely and voluntarily gave consent to search. A reasonable person in Vasquez's position would have understood that he could refuse to consent to a search. Compare McRae, 81 F.3d at 1537 (consent valid even though officer retained license and rental papers where consent was clear and unequivocal and no evidence of duress or coercion).

Vasquez argues that Trooper Rose testified that "despite asking Defendant's consent, Defendant was in fact not free to leave the scene of the commercial vehicle stop even once the inspection had been completed and no evidence of a crime had been discovered." Suggestions In Opposition - Memorandum (Doc. #906-1) at 6. In fact, Trooper Rose testified that "in his mind," after defendant consented to the search and during the pat down, he was not free to leave. Trooper Rose's testimony in this regard is not dispositive as to what a reasonable person in Vasquez's position would have believed. After Vasquez consented to the search, Trooper Rose did a pat down and asked again if he could search the truck and trailer. After Vasquez consented again, Trooper Rose told him to stand by the patrol car but did not handcuff or otherwise restrain him. The Court finds that a reasonable person in Vasquez's situation would have believed that he was not "in custody" and that he was free to leave and/or refuse to consent to the search. See Berkemer v. McCarty, 468 U.S. 420, 440 (1984) (person "in custody" for Miranda purposes when freedom of action is curtailed to degree associated with formal arrest). In these circumstances, the government has satisfied its burden to show that defendant's consent was free of implied duress or coercion. See

Ledesma, 447 F.3d at 1314 (requirement that consent be free of coercion turns on whether reasonable person would believe he was free to leave or deny officer's request to search).

At the hearing, defendant argued that even if Trooper Rose lawfully searched the truck, he needed a warrant before he could search the duffel bag. Because the issue of consent is dispositive, the Court liberally construes defendant's argument to assert that the search of the unopened duffel bag exceeded the scope of any consent. The scope of a search is generally defined by its expressed object. Florida v. Jimeno, 500 U.S. 248, 251 (1991). The standard for measuring the scope of consent is, objectively, what a typical, reasonable person would have understood by the exchange between the officer and the suspect as to the intended scope of the search. Id.; United States v. Wacker, 72 F.3d 1453, 1470 (10th Cir. 1995).

Here, Trooper Rose did not specifically tell Vasquez the purpose or object of his intended search. In cases where the officer seeks general permission to search without stating the object of the search, it is self-evident that he is looking for evidence of illegal activity and "just as obvious that such evidence might be hidden in closed containers." United States v. Snow, 44 F.3d 133, 135 (2d Cir. 1995) (where consent open-ended, reasonable person has no cause to believe that search will be limited); see United States v. Mendoza-Gonzalez, 318 F.3d 663, 669–70 (5th Cir.) (fact that officers did not particularize objective did not limit scope of search which would be deemed reasonable), cert. denied, 538 U.S. 1049 (2003); United States v. Zapata, 18 F.3d 971, 977-78 (1st Cir. 1994) (general consent to search vehicle without knowledge of search's object extends to zipped duffel bag found in trunk); see also Jimeno, 500 U.S. at 252 (suspect may delimit scope of search to which he consents, but if consent is reasonably understood to extend to particular container, Fourth Amendment provides no grounds for requiring more explicit authorization). Accordingly, the search of the duffel bag did not exceed the scope of defendant's consent.

On this record, defendant has not shown that the Court should suppress evidence seized as a result of the vehicle stop and search.  See United States v. Moore, 22 F.3d 241, 243 (10th Cir. 1994) (proponent of motion to suppress bears burden of proof).

**IT IS THEREFORE ORDERED** that Defendant's Motion To Suppress The Fruits Of The Detention And Search That Occurred At W US54 MM 140, Pratt, Kansas On January 13, 2012 (Doc. #558) filed April 10, 2013 be and hereby is **OVERRULED**.

Dated this 29th day of July, 2013, at Kansas City, Kansas.

                                           s/ Kathryn H. Vratil
                                           KATHRYN H. VRATIL
                                           United States District Judge